UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2011-171 (WOB-CJS)

JANIE DOE, ETC., ET AL.                              PLAINTIFFS

VS.                    MEMORANDUM OPINION AND ORDER

WALTON VERONA BOARD OF
EDUCATION, ET AL.                                    DEFENDANTS


This matter is before the Court on the partial motions for summary judgment filed by Janie Doe (Doc. 100) and Vance Sullivan (Doc. 114); the motions for summary judgment filed by Defendants Dan Sullivan (Doc. 120), Bill Boyle, Mark Krummen, Dan Trame, Kyle Bennett, and the Walton-Verona Board of Education (Doc. 123); and Defendants' joint motion for leave to file supplemental authority (Doc. 147).  The Court heard oral argument on these motions on August 9, 2013, and, thereafter, took the motions under further advisement.  *See* Doc. 153.

Having made a thorough review of the record and given careful consideration to the memoranda and oral arguments of the parties, the Court finds that the motions for partial summary judgment (Docs. 100, 114) must be **GRANTED;** Dan Sullivan's motion for summary judgment (Docs. 120) must be **GRANTED;** the motion for summary judgment of Bill Boyle, Mark Krummen, Dan Trame, and Kyle Bennett on Plaintiffs' § 1983 claim (Doc. 123) must be

**GRANTED**; and the Walton-Verona Board of Education's motion for summary judgment on the Plaintiffs' Title IX claim (Doc. 123) must be **DENIED**.

### *FACTUAL HISTORY*

**I.   Introduction**

Plaintiffs Janie Doe, John Doe, and Elizabeth Doe have brought a claim under Title IX against the Walton-Verona Board of Education ("WVBE") and claims under 42 U.S.C. § 1983 against Bill Boyle, Mark Krummen, Kyle Bennett, Dan Trame, and Dan Sullivan in their individual capacities.

At all relevant times, Bill Boyle was the Superintendent of WVBE, Mark Krummen was the Principal of Walton-Verona High School ("WVHS"), Kyle Bennett was the Athletic Director for the WV Schools, and Dan Trame was the Coach of the WV Boys' High School Basketball team.  Dan Sullivan, as well as being Vance Sullivan's father, was the Vice Principal at WVHS.[1]

Additionally, Janie Doe has asserted state law claims of assault, battery, false imprisonment, and intentional infliction of emotional distress against Vance Sullivan.

**II.   Sexual Assault**

In November 2010, Vance Sullivan ("Vance"), an 18-year old senior at WVHS, began texting with Janie Doe ("Janie"), a 13-year old eighth-grader at Walton-Verona Middle School ("WVMS").

---

[1] Plaintiffs have dismissed their claims against the Kentucky High School Athletic Association ("KHSAA") and John Anderson.

*See* Vance Sullivan Deposition at 8, 39-40.  Shortly thereafter, the text messages became sexual in nature.  *See* Vance Depo. at 128, 130.

On December 8, 2010, Janie Doe's eighth grade basketball team was scheduled to play a game at WV.  *Id*. at 133.  On that date, Vance drove to Janie's game and text messaged Janie's friend asking that Janie meet him outside in the parking lot. *See* Janie Doe Deposition at 27-28.  Janie came outside and got into Vance's car.  *Id*. at 28.  While a few details about what happened in the car are in dispute, Vance Sullivan's own testimony establishes that he assaulted Janie Doe that evening. *See* Vance Sullivan Depo. at 140, 147, 149-50.

Janie testified that, after this event, Vance gave her menacing looks at school, but she did not report them.[2]  *See* Janie Depo. at 37-38.

It is undisputed that no one within the WV administration was aware of any type of relationship or interaction between Vance and Janie prior to the December 8, 2010 assault.

However, more than four (4) years before this incident, Vance had been disciplined twice for incidents of a sexual nature occurring while he was enrolled at WVMS.  *See* Plaintiffs' Exs. 30, 32.

---

[2] The WVHS and WVMS share a common building and some of the eighth grade and high school classes overlap.  *See* Deposition of Mark Krummen at 46-48.

3

On February 24, 2006, Vance made unwanted sexual advances towards a fellow seventh-grade female student while both students were in the elevator. *See* Doc. 130-3. The female student reported the incident to WV administration and Vance ultimately received a 60-minute detention for the incident. *See* Plaintiffs' Ex. 30.

Less than a month later, Mark Krummen caught Vance and a female classmate engaging in sexual contact behind the gymnasium after school hours. *See* Plaintiffs' Ex. 32. Krummen testified that this exchange was consensual and that Vance and the girl were both disciplined. *See* Mark Krummen Deposition at 29.

**III. Janie's Report of Assault**

On Friday, December 17, 2010, Janie reported the December 8 incident to her teacher, Amy Cody. *See* Amy Cody Deposition at 11-15. Cody testified that she reported the incident to High School Counselor Melissa Walker and Middle School Counselor Jane Stout that same day. *Id.* at 27.

Cody testified that she disclosed all the facts told to her by Janie and that she was sure both Walker and Stout understood the seriousness of the incident. *Id.* at 27-29. Both of these counselors dispute that testimony, asserting that Cody advised them that Janie wanted to speak to one of them, but that Cody did not give any details or express that it was an emergency

4

situation.  *See* Melissa Walker Affidavit at ¶ 2; Jane Stout Deposition at 20-21.

Janie eventually spoke to Melissa Walker on December 21, 2010.  *See* Walker Aff. at ¶ 6.  Immediately afterward, Walker notified the Boone County Sheriff's Department and WVMS Principal Malina Owens.  *Id*.  Ms. Owens then immediately informed Janie's father and WVHS Principal, Mark Krummen.  *See* Malina Owens Deposition at 19-20.

That same day, Krummen interviewed Janie's friend whose phone Janie used to text Vance on the night of the incident, but the friend told Krummen that the messages had been deleted.  *See* Krummen Depo. at 86.

Also that same day, Detective Everett Stahl of the Boone County Sheriff's Department contacted Krummen and, among other things, asked Krummen not to say anything to Dan Sullivan as Stahl intended on conducting a controlled phone call between Janie and Vance.  *See* Krummen Depo. at 17-18.  However, during the controlled phone call, Vance stated that he thought the police may be involved because "they told Mr. Krummen and Mr. Krummen told my dad."  *See* Vance Depo. at Ex. 101.

Both Krummen and Dan Sullivan deny that they spoke about police involvement on December 21, 2010.  *See* Krummen Depo. at 20; Dan Sullivan Depo. at 12-13.  Dan Sullivan testified that he did tell Vance that day that it was a serious charge and that,

if true, the police would be involved.  *See* Dan Sullivan Depo. at 12-13.  Nonetheless, as a result of the controlled phone call, Vance was charged with Sexual Abuse Second Degree and arrested on December 22, 2010.  *See* Plaintiffs' Ex. 58.

**IV.    Events After the Report of Assault**

After Janie's report on December 21, 2010, Vance was absent from school on December 22nd and the school began its Christmas break on December 23, 2010.  *See* Janie Depo. at 71; Plaintiffs' Ex. 38.  On December 23, 2010, Vance and his parents had a meeting with Krummen, Kyle Bennett, and Dan Trame to discuss Vance's continued participation with the boys' basketball team, including the basketball team's upcoming trip to a tournament in Orlando, Florida.  *See* Vance Depo. at 68.

At the meeting, Vance expressed that, pursuant to his attorney's advice, he would not talk about the incident.  *Id*. at 69.  Krummen made the determination that Vance would not be suspended from basketball at that time, but that he would reconsider that determination based upon the outcome of Vance's forthcoming January 6, 2011 court date on the criminal charges.  *See* Krummen Depo. at 106.

Janie testified that she could not remember anything happening to her while she was on Christmas break which related to Vance's actions or her subsequent report to the police.  *See* Janie Depo. at 72.  However, when classes resumed on January 3,

2011, Janie testified that some of her friends refused to sit with her at lunch and a number of other students would "shoulder check" her, "call [her] a slut and . . . try to cover it up with a cough," and "slam [her] locker shut." *Id.* at 76-78. Janie testified that she did not report any of these incidents to teachers, but she did report them to her parents. *Id.* at 78.

Additionally, early in the first week of January 2011, Krummen met again with Vance to discuss alteration of Vance's schedule going forward so as to ensure that Vance and Janie did not cross paths at school. *See* Krummen Depo. at 57. Specifically, Krummen advised Vance that he was not allowed to go to the middle school during his "Help Desk" course; he was restricted to the office area during his "Academic Leader" course; and, since Janie had a class close to the office area, Krummen would escort Vance to his next class. *Id.* at 57-62.

Moreover, Krummen testified that both he and School Resource Officer Jan Wuchner took on more hall monitoring duties, and he requested that Vance's teachers keep a closer eye on him. *Id.* at 103-104.

Despite these measures, Janie testified that during the first week back from Christmas break she still saw Vance in the hallways, and one day she felt someone push her and when she turned around it had been Vance. *See* Janie Depo. at 82-83. Janie also testified that Dan Sullivan was at the end of the

7

hallway when this occurred, but she was unsure if he saw anything. *Id*. at 337.

Krummen testified that he never witnessed Vance and Janie in the same vicinity during that first week back to school, but he did admit that Janie's parents reported Janie's allegation during that week. *See* Krummen Depo. at 136-37. Janie's father testified that he complained to Krummen on Tuesday, January 4, 2011 about the harassment and Krummen responded that he would "place hall monitors out." *See* John Doe Depo. at 67.

Additionally, Janie testified that at basketball practice during the first week back from Christmas break two of her teammates, one of which was Vance's cousin, "shove[d] [her] down" and gave her "an extra . . . elbow in the stomach." *See* Janie Depo. at 85. Janie stated that she did not report this to her coach, Katelyn Ryan, but she did tell her parents. *Id*. at 87-89.

After Janie's father notified the WV administration of this allegation, Krummen testified that he spoke with Coach Ryan about the incident and she stated that she did not see any altercation. *See* Krummen Depo. at 155. Krummen testified that he spoke again with Coach Ryan and she had nothing to report. *Id*.

Janie's father also reported that he saw Vance at Janie's basketball game on January 6, 2011. *See* Krummen Depo. at 137.

8

Kyle Bennett, the Athletic Director, testified that Vance was at the game but only because he was waiting with the boys' basketball team to get into their locker room because it was occupied at that moment. *See* Kyle Bennett Deposition at 24-25.

It is undisputed that while Vance was present, Janie was in the other locker room with her team and she had no knowledge that he was there. *See* Janie Depo. at 93-94. Krummen testified that, after Janie's father complained about Vance's presence at Janie's January 6th game, Krummen spoke with Bennett and was satisfied that Vance's presence did not warrant further discipline. *See* Krummen Depo. at 142-43.

Janie's father also testified that he reported to Krummen serious, physical threats made by WV students toward Janie on Facebook. *See* John Doe Depo. at 68. Krummen testified that both he and Dan Sullivan spoke with the students who had allegedly made the Facebook threats, but that no additional action was taken. *See* Krummen Depo. at 96-97, 155, 310.

On January 7, 2011, Janie and her mother were driving to school when they allege that John Anderson, Vance Sullivan's uncle and a softball coach at WV, attempted to run them off the road. *See* John Doe Depo. at 261. Immediately after this altercation, Janie's mother reported it to Krummen. *See* Krummen Depo. at 176.

9

Krummen advised Janie's mother that this was not a school matter and that Janie's mother should call the police. *Id*. at 179.  Plaintiffs contacted the police, but they ultimately decided not to press criminal charges. *See* John Doe Depo. at 270.

### V.   Vance and Janie Withdraw from School

On the morning of Friday, January 7, 2011, Krummen met with the Sullivans and advised them that since Vance's criminal charges had not been dismissed at his January 6, 2011 court appearance, Vance would no longer be able to participate in athletics. *See* Krummen Depo. at 333-34.  Vance left school at 10:47 a.m. that day. *See* Plaintiff's Ex. 38.

Later that same day, Janie's parents and their attorney met with Bill Boyle, Mark Krummen, Malina Owens, and the WVBE's attorney. *See* John Doe Depo. at 51-52.  At this meeting, Janie's parents asked that Vance be expelled or removed from the general student population. *Id*. at 52-53.  At that point in time, Boyle and Krummen did not believe they had enough evidence to take further disciplinary action against Vance. *See* Boyle Depo. at 109; Krummen Depo. at 79.  Boyle and Krummen testified that they had contacted Detective Stahl to obtain a tape of the controlled phone call, but Stahl was unresponsive. *See* Krummen Depo. at 82-83; Boyle Depo. at 38-39.

10

After those meetings, Krummen held a faculty meeting at which he advised the entire faculty of the situation and updated them on the progress of the investigation. *Id*. at 91, 93.

The following Monday, January 10, 2011, Vance withdrew from WVHS. *See* Plaintiff's Ex. 38. Thereafter, Vance's family moved in with his grandparents, and Vance transferred to Newport Central Catholic. *See* Plaintiffs' Ex. 85.

On February 1, 2011, Kyle Bennett certified to the KHSAA on a Student Transfer form that Vance was not transferring due to an action by the Board of Education. *Id*. Bennett testified that he asked Krummen about this question on the form, and Krummen responded that Vance was not transferring due to an action by the Board of Education because Vance had withdrawn from WV before the Board took any official action. *See* Bennett Depo. at 37. This form was required in order for Vance to play baseball at Newport Central Catholic. *See* Plaintiffs' Ex. 85.

On January 18, 2011, Janie's mother submitted a letter of intent to homeschool Janie for the remainder of the 2010-2011 school year. *See* John Doe Depo. at 121, Ex. WV10. Prior to withdrawing Janie for homeschooling, Janie's parents also looked into WV's "Homebound" program, which allows a student to be homeschooled for medical reasons with the intent on returning to school. *Id*. at 122.

Also, Janie's parents asked the school to obtain a waiver so that Janie could continue playing basketball. *Id*. However, Kyle Bennett testified that he never submitted a waiver because a KHSAA bylaw excludes homeschooled or "Homebound" students from participating in athletics. *See* Bennett Depo. at 29-30.

**VI.  Events After Withdrawal**

At some point in January 2011, Krummen became aware that students were wearing t-shirts that said "Keep 5 Alive" in honor of the number five (5) jersey Vance had previously worn for the boys' basketball team. *See* Krummen Depo. at 96. In response, Krummen advised Dan Sullivan that he needed to enforce a "zero tolerance" policy regarding this slogan. *Id*. at 98. On a few occasions, Dan Sullivan ordered students to remove t-shirts bearing this slogan. *Id*. at 95-97.

On February 15, 2011, the boys' basketball team had their Senior Night game and a number of students in attendance wore "Keep 5 Alive" t-shirts and carried "Keep 5 Alive" signs. *See* Plaintiffs' Exs. 14-17. Additionally, a few players on the basketball team wore shirts during warm-ups which had "Sullivan" and "5" on the back. *Id*. Athletic Director Kyle Bennett testified that he confiscated a poster that referred to Vance, but he did not make anyone remove their t-shirts. *See* Bennett Depo. at 40. After this event, Krummen reprimanded Bennett for his handling of this situation. *See* Krummen Depo. at 194-95.

12

Krummen testified that he did not conduct an investigation into the event because he did not believe it directly involved Janie or Vance, and neither of them was present at the game. *See* Krummen Depo. at 99.

Although he could not provide a date, Janie's father testified that Janie enrolled in Community Christian Academy shortly after withdrawing from classes at WV.  *See* John Doe Depo. at 124-25.  Janie testified that she believed she had already been enrolled at Community Christian Academy when she heard about the Senior Night game.  *See* Janie Depo. at 113.

Plaintiffs initiated this lawsuit on August 23, 2011.  *See* Doc. 1.

## *ANALYSIS*

### I.   Title IX Claim

Plaintiffs' Title IX Claim against the WVBE is based upon their assertion that Janie was subjected to a severe and pervasive sexually hostile environment, the WVBE knew of the harassment, and it was deliberately indifferent to that harassment.[3]  *See* Doc. 129 at p. 13.

"Title IX may support a claim for student-on-student sexual harassment when the plaintiff can show (1) that the sexual harassment was so severe, pervasive, and objectively offensive

---

[3] WVBE admits that it is a recipient of federal funding and, thus, it is subject to Title IX.  *See* Doc. 24 at ¶¶ 7, 24.

13

that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) that the funding recipient had actual knowledge of the sexual harassment, and (3) that the funding recipient was deliberately indifferent to the harassment." *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (citing *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 633 (1999)).

The Court, after carefully reviewing the entire record and considering the excellent briefs and oral arguments of the parties, finds that jury issues exist regarding the liability of the WVBE under the above standard.

Therefore, the WVBE's motion for summary judgment regarding Plaintiffs' Title IX claim is **DENIED**.

**II.  § 1983 Claims**

Plaintiffs also filed claims under 42 U.S.C. § 1983 against WVHS Principal Mark Krummen, WV Superintendent Bill Boyle, WV Athletic Director Kyle Bennett, WVHS Boys' Basketball Head Coach Dan Trame, and WVHS Vice Principal Dan Sullivan in their individual capacities.[4]  *See* Doc. 19.

To succeed on a § 1983 claim, Plaintiffs must show (1) that the Defendants' actions caused the deprivation of a clearly established federal right and (2) the deprivation was caused by

---

[4] "Title IX does not provide for claims against individuals in their personal capacities." *Guy v. Lexington Fayette Urban Cnty. Gov't*, No. 1998-cv-431-WOB, 2013 WL 2382964, at *14 (E.D. Ky. May 30, 2013) (citing *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999)).

14

a person acting under the color of state law. *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006) (citation omitted).

Similar to their Title IX claim against the WVBE, Plaintiffs' § 1983 claims against the above-referenced Defendants also rely on Plaintiffs' assertion that these Defendants were deliberately indifferent to severe, pervasive, and objectively-offensive harassment towards Janie. *See* Doc. 132 at pp. 2-3.

Plaintiffs concede that individual § 1983 defendants generally are not liable where the injuries are caused by purely private actors. *Id*. at p. 3. However, Plaintiffs assert that Defendants can be liable under the "state-created-danger theory" if they can show that Defendants, through affirmative acts, increased the risk of harm to Janie and then acted with deliberate indifference to the private actors' harassment. *Id*; *see also McQueen*, 433 F.3d at 464.

"Pursuant to the state-created-danger theory, a governmental actor can be held responsible for an injury committed by a private person if: (1) an affirmative act by the governmental actor either created or increased the risk that the plaintiff would be exposed to the injurious conduct of the private person; (2) the governmental actor's act especially endangered the plaintiff []; and (3) the governmental actor had

15

the requisite degree of culpability." *Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952, 962 (S.D. Ohio 2008) (citing *McQueen*, 433 F.3d at 464).

While Plaintiffs have proffered enough evidence to allow their Title IX claim against the WVBE to be submitted to a jury, the standards for establishing liability under Title IX and § 1983 differ. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

A Title IX plaintiff can impute liability to the school district by showing that a single school administrator with authority to take corrective action responded with deliberate indifference. *Id.* (citing *Gebster v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). The action must "deprive the plaintiff of access to the educational opportunities or benefits provided by the school," but it need not amount to a violation of the victim's constitutional rights. *See Soper*, 195 F.3d at 854.

However, when an individual defendant has asserted the defense of qualified immunity to a plaintiff's § 1983 claims, the Court must examine the facts as they pertain to the state of mind and subsequent action or inaction taken by that individual defendant. *See Arnold v. Lexington-Fayette Urban Cnty. Gov't*, 352 F. App'x 972, 973 (6th Cir. 2009); *Phillips v. Roane County, Tenn.,* 534 F.3d 531, 542 (6th Cir. 2008); *Jerauld ex rel.*

16

*Robinson v. Carl*, No. 06-cv-05-WOB, 2009 WL 749781, at *7 (E.D. Ky. Mar. 19, 2009), *aff'd*, 405 F. App'x 970 (6th Cir. 2010).

"Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established [] constitutional rights of which a reasonable person would have known." *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) (citations and internal quotations omitted).

While Plaintiffs have shown that the actions, or lack thereof, taken by the various administrators as a whole are enough to submit their Title IX claim against the WVBE to a jury, Plaintiffs cannot meet their burden of establishing that the individual Defendants are not entitled to qualified immunity. *See Sheets v. Mullins,* 287 F.3d 581, 586 (6th Cir. 2002) ("The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (citation omitted).

Many of the events on which Plaintiffs rely as the basis for their § 1983 claims do not violate clearly-established constitutional rights of which a reasonable person would have known. *See Williams*, 455 F. App'x at 618 (citation omitted); *see also Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 513 (6th Cir. 1996).

17

For example, allowing Vance to go on the December basketball trip, certifying to the KHSAA that Vance was not transferring schools because of a Board action, and not sufficiently quelling the "Keep 5 Alive" movement at the school are not actions which a reasonable person would believe violated Janie's clearly established constitutional rights.  In fact, while Janie may have been upset about these actions, they do not constitute direct harassment of Janie.

Moreover, Plaintiffs cannot establish that any individual Defendant acted with enough culpability that he, individually, increased the risk that Janie would be subjected to severe, pervasive, and objectively offensive harassment.  *See McQueen*, 433 F.3d at 464.

The Sixth Circuit has rejected the state-created-danger theory where "there [is] no affirmative act that created or increased the risk [and] the victim would have been in about the same or even greater danger even if the state officials had done nothing."  *Id.* at 466.

Here, after reviewing the voluminous record, the Court has found no *affirmative* act committed by any of the individual Defendants which could be construed to have *caused* an increased risk that Janie would be subjected to severe, pervasive, and objectively-offensive harassment at the hands of her peers.

18

Therefore, the individual Defendant school officials are entitled to qualified immunity from the Plaintiffs' § 1983 claims.  Thus, the individual Defendants' motion for summary judgment regarding the Plaintiffs' § 1983 claims is **GRANTED** on the basis of qualified immunity.

### III. State Law Claims

Plaintiff Janie Doe also alleges state law claims of assault and battery, false imprisonment, and intentional infliction of emotional distress (IIED) against Vance Sullivan pursuant to 28 U.S.C. § 1367.

Janie has moved for partial summary judgment on her claims of assault and battery, and Vance has moved for partial summary judgment on Janie's IIED claim.  *See* Docs. 100, 114.

### A.    Janie Doe's Claim of Assault and Battery

For the reasons stated in the Plaintiffs' partial motion for summary judgment (Doc. 100), the Court holds that Vance Sullivan's own testimony establishes his liability for the civil claim of assault and battery against Janie Doe.

Thus, Janie's motion for partial summary judgment is **GRANTED.**

### B. Janie Doe's Claim of Intentional Infliction of Emotional Distress.

Since Janie's emotional distress claim arises out of the same facts which form her assault and battery claim, her

19

emotional distress claim must be dismissed.  *See Childers v. Geile*, 367 S.W.3d 576, 582-83 (Ky. 2012); *Rigazio v. Archdioceses of Louisville*, 853 S.W 2d 295, 299-300 (Ky. Ct. App. 1993).

Therefore, Vance's motion for partial summary judgment is **GRANTED**.

**THEREFORE, THE COURT BEING ADVISED, IT IS ORDERED:**

1. That Dan Sullivan's  motion for summary judgment (Doc. 120) be, and is hereby, **GRANTED;**

2. That the motion for summary judgment of Bill Boyle, Mark Krummen, Dan Trame, and Kyle Bennett on Plaintiffs' § 1983 claim (Doc. 123) be, and is hereby, **GRANTED**;

3. That the motion for summary judgment of the Walton Verona Board of Education on Plaintiff's Title IX claim (Doc. 123) be, and is hereby, **DENIED**;

4. That Janie Doe's and Vance Sullivan's motions for partial summary judgment (Docs. 100, 114) be, and are hereby, **GRANTED**;

5. That Defendants' joint motion for leave to file supplemental authority (Doc. 147) be, and is hereby, **GRANTED**;

6. That, the Court being of the opinion that settlement of this matter is highly desirable due to mounting legal

expenses, the United States Magistrate Judge assigned to this case is directed to commence mediation as soon as practical.  **A report of the result of said mediation shall be made to the Court no later than October 15, 2013.**

This 16th day of August, 2013.



Signed By:

_**William O. Bertelsman**_   WOB

**United States District Judge**